Filed 9/9/14

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| BARBARA LYNCH et al., | D064120 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2011-00058666-CU-WM-NC) |
| CALIFORNIA COASTAL COMMISSION, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas III, Judge. Reversed.


Kamala D. Harris, Attorney General, John A. Saurenman, Assistant Attorney General, Jamee J. Patterson and Hayley Peterson, Deputy Attorneys General, for Defendant and Appellant.

Axelson & Corn, Jonathan C. Corn; Pacific Legal Foundation, Paul J. Beard II and Jennifer F. Thompson, for Plaintiffs and Respondents.

INTRODUCTION

The California Coastal Commission (Commission) appeals from a judgment in a mandamus action directing the Commission to remove three conditions from a coastal development permit amendment (permit) issued to Barbara Lynch and Thomas Frick (collectively, respondents). The Commission contends respondents waived any challenge to these conditions by signing and recording documents agreeing to them and then accepting the benefit of the permit by completing their project. The Commission further contends the conditions were valid and supported by substantial evidence. We agree with both contentions and reverse the judgment.

BACKGROUND

Respondents own adjacent, bluff-top homes in Encinitas. For at least two decades, their homes were protected by a 100-foot wooden erosion control structure and a 100-foot mid-bluff wall. In addition, a private stairway along the bluff face provided them with beach access from their homes.

In 2003 respondents applied to the City of Encinitas (City) for authorization to replace the wooden erosion control structure and the mid-bluff wall. As part of the project, they also planned to remove and replace the lower section of the stairway.

In 2009 the City approved the project, finding the project would not adversely affect the City's general plan policies or its municipal code provisions. The City conditioned its approval on respondents obtaining a permit from the Commission.

The same year, respondents applied to the Commission for the required permit. While their application was pending, a severe storm caused the bluff below Lynch's home

2

to collapse. The collapse destroyed portions of the wooden erosion control structure, mid-bluff wall, and stairway. By the time the Commission considered the permit application in 2011, respondents were seeking to demolish the remainder of the wooden erosion control structure, construct a new 100-foot long shotcrete seawall below both lots, install up to 75 feet of mid-bluff geogrid protection below Lynch's lot and part of Frick's lot, and reconstruct the lower section of the stairway.

The Commission approved a permit allowing only the demolition and reconstruction of the seawall and the installation of the mid-bluff geogrid protection. The permit included numerous special conditions. Among these conditions were special condition 1.a., which precluded reconstruction of the lower section of the stairway, and special conditions 2.1 and 3, which limited the permit's duration to 20 years. Respondents objected to these special conditions during the application process.

The permit also included a special condition requiring respondents to record deed restrictions in a form approved by the Commission's executive director. The deed restrictions stated the Commission approved the permit subject to the special conditions, and but for the imposition of the special conditions the project would not be consistent with the California Coastal Act of 1976 (Act) (Pub. Resources Code, § 30000 et seq.)[1] and the Commission would not have approved the permit. The deed restrictions also stated respondents elected to comply with the special conditions in order to undertake the

---

[1] Further statutory references are also to the Public Resources Code unless otherwise stated.

3

development authorized by the permit and, in consideration for the permit's issuance, they irrevocably covenanted with the Commission that the special conditions constituted covenants, conditions and restrictions running with the land for the duration of the permit.

Respondents filed a petition for writ of mandate challenging the conditions precluding them from rebuilding the lower section of the stairway and limiting the permit's duration to 20 years. Meanwhile, respondents signed and recorded the required deed restrictions, satisfied the other prior-to-issuance permit conditions, obtained the permit, and constructed their project.

The Commission moved for judgment under Code of Civil Procedure section 1094, arguing respondents were barred from proceeding with their mandamus action because they agreed to the permit conditions and accepted the benefit of the permit. The superior court denied the motion, finding respondents had not specifically agreed to nor necessarily accepted the challenged conditions.

A few months later, respondents moved for judgment, arguing the condition precluding them from rebuilding the lower portion of the stairway was invalid because that portion of the project did not require a permit. In addition, respondents argued the conditions limiting the duration of the permit to 20 years were invalid because the conditions have no nexus to the seawall's impacts and the Commission had no other authority to impose them. The superior court substantially agreed with respondents' position. The court granted the motion and issued a writ directing the Commission to remove the challenged conditions from the permit.

4

DISCUSSION

I

*Waiver by Agreeing to Conditions and Accepting Permit Benefits*

As it did below, the Commission contends on appeal respondents waived their right to challenge the permit conditions when they signed and recorded deed restrictions agreeing to the permit conditions and then accepted the permit's benefit by constructing their project. We agree.

Generally, a property owner may only challenge an allegedly unreasonable permit condition by refusing to comply with the condition and bringing a mandate action to have the condition declared invalid. (*Building Industry Assn. v. City of Oxnard* (1985) 40 Cal.3d 1, 3, fn. 1 (*Building Industry Assn*).) If the property owner complies with the condition, the property owner waives the right to legally challenge it. (*Ibid.*; see *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 19, fn. 9 (*Hensler*); *County of Imperial v. McDougal* (1977) 19 Cal.3d 505, 510-511; *Edmonds v. County of Los Angeles* (1953) 40 Cal.2d 642, 653; *Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1484; *Rossco Holdings Inc. v. State of California* (1989) 212 Cal.App.3d 642, 654-655; *Pfeiffer v. City of La Mesa* (1977) 69 Cal.App.3d 74, 78, modified by statute as stated in *Sterling Park, L.P. v. City of Palo Alto* (2013) 57 Cal.4th 1193, 1200.) The rule stems from the equitable maxim, "He who takes the benefit must bear the burden." (Civ. Code, § 3521; *Edmonds v. County of Los Angeles*, *supra*, at p. 653; see *Peers v. McLaughlin* (1891) 88 Cal. 294, 299 ["[N]o person, whether minor or adult, can be permitted to adopt that part of an entire

5

transaction which is beneficial, and reject its burdens. [¶] This commanding principle of justice is so well established, that it has become one of the maxims of the law."].)

Respondents contend this rule does not apply to them because they did not, in fact, voluntarily agree to the conditions. They objected to the conditions during the proceedings before the Commission and then timely filed a petition challenging them. They completed the steps necessary to obtain the permit to save their homes. Essentially, they contend they submitted to the conditions under protest and duress.[2]

Although there are two recognized exceptions to the general waiver rule, neither applies here. The first exception, codified in Government Code section 66020, allows a developer to comply with a condition under protest and proceed with development while simultaneously challenging the condition. (Gov. Code, § 66020, subd. (a) & (d)(2); *Hensler*, *supra*, 8 Cal.4th at p. 19, fn. 9; *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 241.) However, this exception applies only to conditions imposed by local agencies that "divest the developer of money or a possessory interest in property." It does not apply to conditions imposed by state agencies or to conditions that restrict "the manner in which a developer may use its property." (*Sterling Park, L.P. v.*

---

[2] The evidence in the record indicates Frick's home was not in immediate danger at the time the Commission approved the permit. To the extent Lynch's home was in immediate danger, she alternatively could have applied for an emergency permit from the Commission's executive director, but did not. (§ 30624; Cal. Code Regs., tit.14, § 13136 et seq.) The emergency permit would have essentially maintained the status quo pending the outcome of this litigation by allowing her to address the immediate danger without giving her any vested rights. (*Barrie v. Cal. Coastal Com.* (1987) 196 Cal.App.3d 8, 17-18.)

6

*City of Palo Alto*, *supra*, 57 Cal.4th at p. 1207; *Trend Homes, Inc. v. Central Unified School Dist.* (1990) 220 Cal.App.3d 102, 111.)

The second exception applies when an agency imposes new conditions on a permit for a later phase of a project already underway. (*Building Industry Assn.*, *supra*, 40 Cal.3d 1, 3, fn. 1; *Rezai v. City of Tustin* (1994) 26 Cal.App.4th 443, 450; *Laguna Village, Inc. v. County of Orange* (1985) 166 Cal.App.3d 125, 127-128; *McLain Western #1 v. County of San Diego* (1983) 146 Cal.App.3d 772, 777.) In such circumstances, the developer has already commenced the project, made commitments, and incurred costs, which are typically irrevocable decisions. The developer, therefore, has no economically practicable option to elect not to accept the subsequent permit and its accompanying conditions. (*McLain Western #1 v. County of San Diego*, *supra*, at p. 777.)

At least one appellate court has since limited the second exception to challenges to fee conditions, making it largely indistinguishable from the first exception. (*Rezai v. City of Tustin*, *supra*, 26 Cal.App.4th at p. 451; see *Hensler*, *supra,* 8 Cal.4th at p. 19, fn. 9 [suggesting after the enactment of Government Code section 66020 the first exception is the only exception to the general rule].) Assuming without deciding the second exception continues to apply to nonfee conditions, it still does not apply in this case as this case does not involve new conditions imposed on a later phase of a project already underway.

Nonetheless, respondents believe there is or should be an "under protest" exception for permit applicants who are opposed to nonfee conditions like those at issue in this case and desire to build their projects while simultaneously challenging the conditions. We decline to adopt such an exception for several reasons. First, the

7

exception would effectively swallow the general rule as many, if not most, permit applicants are required to submit to conditions they view unfavorably in order to obtain a permit. Second, allowing permit applicants to accept the benefits of a permit while challenging its burdens would foster litigation and create uncertainty in land use planning decisions. Finally, unlike an invalid fee condition, an invalid nonfee condition is not readily quantified and remedied. If an agency learns a nonfee condition is invalid before a project is built, the agency may be able to address the impacts underlying the condition in an alternate manner. However, if an agency learns a nonfee condition is invalid after a project is built, the agency may have no practical means of addressing the underlying impacts. Given these policy considerations, we conclude the need for or desirability of an under protest exception of the type advocated by respondents is a matter best left for legislative resolution.

The dissent adopts respondents' position without discussing the general waiver rule, the currently recognized exceptions, or the wisdom of judicially recognizing a new exception for respondents' situation. In addition, the dissent suggests it was appropriate for respondents to sign and record documents purporting to establish covenants running with the land when respondents did not actually intend to establish such covenants. In the dissent's view, the documents' severability clauses not only allow respondents' subterfuge, but require us to disregard the documents' contents because the Commission did not establish by clear and convincing evidence respondents' actually meant what they said in the documents.

8

Absent clear, supporting authority, which the dissent has not identified, we are unwilling to condone deliberate subterfuge in recorded documents as doing so would subvert the documents' noticing function. It is also unnecessary for us to condone such conduct as respondents had a reasonable option short of deliberate subterfuge to address any immediate danger to their properties pending the outcome of this litigation. (See fn. 2, *ante*.)

Moreover, we disagree with the dissent's view that respondents' deliberate subterfuge amounted to a failure of proof on the Commission's part. The rules governing the interpretation of deed restrictions are the same as the rules governing the interpretation of contracts. We are required to interpret them in a way that is both reasonable and carries out their intended purpose. We are also required to ascertain the parties' intent solely from the language of the documents whenever possible. (*Costa Serena Owners Coalition v. Costa Serena Architectural Com.* (2009) 175 Cal.App.4th 1175, 1199; *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1378.) As the language of the documents is not ambiguous regarding respondents' intent to establish covenants running with the land in favor of the Commission, the language of the documents controls and provides ample evidence of respondents' waiver.[3]

---

[3] The mere existence of a severability clause cannot establish an ambiguity or every provision in every contract with a severability clause would arguably be ambiguous.

9

## II

### *Validity of 20-Year Duration Condition*

#### A

Even if respondents had not waived their right to challenge the permit conditions, the Commission contends it lawfully limited the duration of respondents' permit. We agree with this contention as well.

#### B

The court's role in reviewing Commission decisions is to determine " 'whether (1) the [Commission] proceeded without, or in excess of, jurisdiction; (2) there was a fair hearing; and (3) the [Commission] abused its discretion.' " (*Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 921 (*Ross*).) The Commission abuses its discretion if it does not proceed in the manner required by law, its order or decision is not supported by the findings, or its findings are not supported by substantial evidence. (*Ibid.*)

In determining whether the Commission's findings are supported by substantial evidence, we examine the whole record and consider all relevant evidence, including evidence detracting from the Commission's decision. While we engage in some weighing to fairly estimate the worth of the evidence, we do not conduct an independent review of the record where we substitute our own findings and inferences for the Commission. It is the Commission's role to weigh the preponderance of conflicting evidence and we may reverse the Commission's decision only if no reasonable person could have reached the same conclusion based on the same evidence. (*Ross*, *supra*, 199 Cal.App.4th at pp. 921-922.)

C

Chapter 3 of the Act contains the standards for determining the permissibility of development projects subject to the Act.  (§ 30200, subd. (a).)  We must liberally construe these standards to achieve the Act's purposes and objectives.  (§ 30009.)

Included within the standards is a requirement the Commission find a proposed project conforms to the applicable certified local coastal program.  (§ 30604 (b).)  Here, the City's local coastal program policies and implementing regulations applicable to seawalls require that a seawall be necessary to protect the principal bluff top structure; not cause, promote, or encourage bluff erosion or failure; be visually compatible with the character of the surrounding area; and not unnecessarily restrict or reduce the use of or access to existing beach width.  (Encinitas General Plan and Local Coastal Program Land Use Plan, Resource Management Element, Policy 8.5; Encinitas Mun. Code, §30.34.020, subd. (C)(2)(b)(2)-(5).)

In addition, for projects such as respondents, which are located between the nearest public road and the sea shoreline, the Act requires that the Commission find the project conforms to the Act's public access and public recreation policies.  (§ 30604 (c).)  For seawalls, the Act further requires that the Commission find the seawall is:  (1) required to serve coastal-dependent uses or to protect existing structures or public

11

beaches from erosion; and (2) designed to eliminate or mitigate adverse impacts on local shoreline sand supply.  (§ 30235.)[4]

Here, the Commission imposed the condition limiting the permit's duration because it found:  (1) the seawall is only required to protect respondents' existing homes and is not intended to be a permanent structure accommodating any future redevelopment of the homes; (2) the seawall will have long-term impacts on adjacent properties to the north and may have long-term impacts on other adjacent properties which are not yet fully addressable;[5] (3) shoreline protection strategies are evolving, particularly in light of climate change and sea level rise; and (4) notwithstanding its theoretical lifespan, the seawall will likely need augmentation, replacement, or substantial changes within 20 years because of sea level rise and the seawall's location in a high hazard area. Essentially, the duration limit allows the Commission to revisit the need for the seawall

---

[4]     Section 30235 provides in full, "Revetments, breakwaters, groins, harbor channels, seawalls, cliff retaining walls, and other such construction that alters natural shoreline processes shall be permitted when required to serve coastal-dependent uses or to protect existing structures or public beaches in danger from erosion and when designed to eliminate or mitigate adverse impacts on local shoreline sand supply.  Existing marine structures causing water stagnation contributing to pollution problems and fishkills should be phased out or upgraded where feasible."

[5]     More particularly, the Commission noted studies have shown wave reflection off of a seawall and increased turbulence at its terminus leads to accelerated erosion along adjacent, unprotected properties.  In this case, such accelerated erosion will likely cause the bluff of the unprotected properties to the north to collapse, which could lead to a domino effect of additional requests for "much more substantial and environmentally damaging seawalls to protect the residences."  Although the proposed seawall is designed to reduce the impacts to the northern adjacent properties, the impacts cannot be eliminated and are especially problematic because "the seawall will be an isolated structure in a stretch of largely unprotected shoreline."

or require further mitigation for its impacts based on a lifespan corresponding to, but not exceeding, the remaining anticipated lifespan of respondents' existing homes.

The Commission's findings are presumed to be supported by substantial evidence (*Ross*, *supra*, 199 Cal.App.4th at p. 921) and respondents have not directed us to any record evidence undermining these findings. While there may be, as respondents and the dissent suggest, other means of satisfactorily addressing the project's long-term impacts, we may not substitute our judgment for the Commission's. It is the Commission's role to weigh the preponderance of any conflicting evidence before it and we may reverse the Commission's decision only if a reasonable person could not have reached the same conclusion. (*Id.* at p. 922.)

Moreover, respondents have not identified nor have we located any authority categorically precluding the Commission from imposing a condition limiting the duration of a permit. To the contrary, the Commission has broad discretion to impose conditions to mitigate the seawall's impacts. (*Ocean Harbor House Homeowners Assn. v. California Coastal Com.* (2008) 163 Cal.App.4th 215, 242 (*Ocean Harbor*)). Since the Commission imposed the conditions limiting the permit's duration to ensure the seawall's long-term impacts do not extend beyond the time period for which the seawall's existence can be reasonably justified to protect respondents' existing homes, we conclude the conditions fell within the Commission's discretion and were valid.

The dissent concludes section 30235 precludes the Commission from imposing any condition on the seawall except a condition intended to eliminate or mitigate the seawall's adverse impacts on the local shoreline sand supply. This same position was

13

rejected in *Ocean Harbor*, *supra*, 163 Cal.App.4th at p. 241. As the court explained, "The language of section 30235 is permissive, not exclusive. It allows seawalls under certain conditions: (1) when necessary to protect existing structures and (2) when they can be designed to minimize sand loss. The statute does not purport to preempt other sections of the Act that require the Commission to consider other factors in granting coastal development permits. (E.g., §§ 30604, subd. (c) [the Commission 'shall' make findings that the permit complies with public access and recreational policies], 30251 [scenic and visual qualities of coastal areas 'shall' be considered and protected as a resource of public importance], 30240 [environmentally sensitive habitats 'shall' be protected].) Nor does the statutory language purport to limit the Commission's duty to consider other impacts and discretion to impose conditions to mitigate them. Homeowners [offer] no legislative history to support [their] view of the statute. Moreover, had it been the Legislature's intent to limit permit conditions, one would reasonably have expected direct or express limiting language—e.g., seawalls shall be permitted, and the Commission may *only* impose conditions that mitigate sand loss; or seawalls shall be permitted, and the Commission may not impose any conditions other than those that mitigate sand loss. [¶] . . . [¶]

"The Act was enacted as a comprehensive scheme to govern land use planning for the entire coastal zone of California. [Citation.] Its broad goals are protection of the coastline and its resources, and maximization of public access. [Citation.] . . . [¶] . . . Homeowners [provide] no evidence suggesting that the Legislature

intended to give protection of the sand supply exclusive priority over all of the Act's other goals.

"Finally, even if section 30235 were reasonably susceptible of Homeowners's interpretation, we would reject it as inconsistent with the Legislature's express command that the Act 'be liberally construed to accomplish its purposes and objectives.' [Citations.] [¶] In short, we conclude that section 30235 does not limit the type of conditions that the Commission may impose in granting a permit to construct a seawall. Rather, the Commission has broad discretion to adopt measures designed to mitigate all significant impacts that the construction of a seawall may have." (*Ocean Harbor*, *supra*, 163 Cal.App.4th at pp. 241-242.) We agree with the *Ocean Harbor* court's analysis, which the dissent has not countered.

The dissent alternatively concludes the conditions limiting the permit's duration are invalid because they do not mitigate any adverse impacts. The record does not support this conclusion because, as we explained above, the conditions are aimed at addressing the project's likely long-term impacts to adjacent, unprotected properties from accelerated erosion by ensuring there is an opportunity to revisit the need for the seawall or require further mitigation for its impacts at the point in time it will likely require augmentation, replacement, or substantial change anyway.

Finally, the dissent concludes the conditions limiting the permit's duration constitute an unconstitutional taking. The dissent's conclusion presupposes a particular outcome when respondents apply to renew their seawall in the future. However, the outcome of any subsequent application is purely speculative and until the Commission

15

reaches a final decision on the application any related takings claim is not ripe for adjudication. (*Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1430.)

III

*Validity of Condition Precluding the Rebuilding of the Lower Stairway*

The Commission also contends it lawfully conditioned the permit on the removal of the lower stairway from the project plans. We agree once again.

A

1

Preliminarily, the Commission correctly asserts reconstruction of the lower stairway is not exempt from the Act's permitting requirements. The Act allows the replacement of an existing structure without a permit only if the structure was destroyed by a disaster, conforms to applicable zoning requirements, is for the same use, is no more than 10 percent larger than its previous size, and is in the same location. (§ 30610, subd. (g)(1).) While the City's local coastal program contains similar qualifications, the program nonetheless requires a coastal development permit for projects governed by the City's coastal bluff overlay regulations.[6] (Encinitas Mun. Code, § 30.80.050.) Respondents' project is governed by these regulations because the regulations apply to all parcels of land within the City where a coastal bluff is present. (Encinitas Mun. Code,

---

6    The dissent concludes the coastal bluff overlay zone permit requirements are invalid because they conflict with section 30610, subdivision (g)(1). We disagree because the application of section 30610, subdivision (g)(1), is expressly subject to conformance with local zoning requirements.

16

§ 30.34.020, subd. (A).) Therefore, to the extent the reconstruction of the lower stairway is a replacement project, it is not exempt from the permitting requirements.

2

To the extent the reconstruction of the lower stairway is a repair or maintenance project, it is also not exempt from the permitting requirements. The Act generally allows repair or maintenance activities without a permit if the activities "do not result in an addition to, or enlargement or expansion of, the object" of the activities. (§ 30610, subd. (d).) However, an exception to the general rule specifies a permit is required for "[a]ny repair or maintenance to facilities or structures or work located in an environmentally sensitive habitat area, any sand area, within 50 feet of the edge of a coastal bluff or environmentally sensitive habitat area, or within 20 feet of coastal waters or streams that include: [¶] (A) The placement or removal, whether temporary or permanent, of rip-rap, rocks, sand or other beach materials or any other forms of solid materials; [¶] (B) The presence, whether temporary or permanent, of mechanized equipment or construction materials." (Cal. Code Regs., tit. 14, § 13252, subd. (a)(3); accord, Encinitas Mun. Code, § 30.80.050, subd. (C).) As the reconstruction of the lower stairway would occur on a coastal bluff edge and would involve both the placement of solid materials and the presence of mechanized equipment and construction materials, the general rule does not apply and the reconstruction requires a permit.[7]

---

[7] The dissent does not address this regulatory exception in concluding no permit is required.

17

B

Since the reconstruction of the lower stairway requires a permit, the reconstruction must conform to the City's local coastal program. (§ 30604 (b).) The City's local coastal program is combined with its general plan and many of the general plan's policies are incorporated into the program. Of particular relevance here, the program includes Policy 1.6, subdivision (a), of the General Plan's Public Safety Element. This policy provides "for the reduction of unnatural causes of bluff erosion" by "[o]nly permitting public access stairways and no private stairways . . . ." The program also includes Policy 6.7 of the General Plan's Circulation Element. This policy discourages and requires the phasing out of private access to the beach over the bluffs.

Respondents contend these general plan policies are inapplicable because the City has not passed any regulations implementing them; however, as the Commission points out, the City's coastal bluff overlay regulations, which are also part of the City's local coastal program, effectively implement these policies by allowing only public access facilities on coastal bluffs. (Encinitas Mun. Code, § 30.34.020, subd. (B)(2)(a).) As the reconstruction of the lower stairway is inconsistent with both the general plan policies and the coastal bluff overlay regulations, it is necessarily inconsistent with the City's local coastal program. Accordingly, we conclude the Commission validly precluded reconstruction of the stairway as a condition of approving the permit.

Nevertheless, respondents make much of the fact the City previously approved the project, including the stairway, after specifically finding it would not adversely affect the City's general plan policies or its municipal code provisions. They suggest it is

18

disingenuous for the Commission to disapprove the stairway portion of the project for nonconformance with these policies and provisions after the City previously found conformance.

We do not share respondents' concern because, at the time the City approved the project, the stairway portion of it was substantially different. As the City described it, "A stairway currently exists on the bluff face and will remain. However, portions of the stairwell most adjacent to the existing mid-bluff retaining wall and lower seawall will be removed as necessary to allow for the installation of the proposed improvements and will be replaced to its original configuration with the same materials, dimensions and colors once [the installation of the proposed improvements is] completed." In other words, at the time the City approved the project, the stairway portion involved only the detachment and reattachment of parts of the stairwell as necessary to facilitate other construction. The lower portion of stairway had not been destroyed and the City had no occasion to consider whether reconstruction of it conformed to the general plan policies and coastal bluff overlay regulations disfavoring and requiring the phasing out of private access stairways. Thus, contrary to respondents' assertions, we conclude the City's prior conformance finding has no bearing on the validity of the Commission's nonconformance finding.

19

DISPOSITION

The judgment is reversed.  The Commission is awarded its appeal costs.


_____

McCONNELL, P. J.

I CONCUR:


_____

AARON, J.

NARES, J., dissenting:

I respectfully dissent from the majority's decision to reverse the judgment in this matter.

A. *Introduction*

I would affirm the trial court's decision striking the California Coastal Commission's (Commission's) permit expiration conditions requiring the seawall permit to "expire" in 20 years unless the homeowners Barbara Lynch and Thomas Frick (the homeowners) reapply for a permit, and the Commission exercises its discretion to grant it. Those conditions are contrary to Public Resources Code[1] section 30235 of the California Coastal Act of 1976 (§ 32000 et seq.) (Coastal Act), as that code section mandates issuance of a permit for a seawall so long as it is necessary to protect from erosion and is designed to mitigate against adverse impacts. I would further affirm the trial court's decision that the conditions are regulatory "takings" barred by the state and federal constitutions. I would also affirm the trial court's decision that the condition barring repairs to the staircase that provides the homeowners with access to the beach is contrary to both the Coastal Act and the City of Encinitas's (the City's) Local Coastal Program. Finally, the Commission's assertion that the matter should be remanded to allow it to "revise" the conditions is without merit. Because there is no circumstance under which the expiration date and stairway denial could be revised to make them

---

[1] All further undesignated statutory references shall be to the Public Resources Code.

consistent with applicable law, no remand to the Commission for additional review was required.

B. *Factual and Procedural Background*

1. *The homeowners and their homes*

The homeowners own adjacent residential properties located atop an 80-foot oceanfront bluff on Neptune Avenue, in Encinitas, California. The easterly and westerly property lines for their homes are Neptune Avenue and the mean high-tide line of the Pacific Ocean, respectively. Thus, the properties consist of the bluff top areas improved with the homeowners' homes, the steep coastal bluffs improved with a shared staircase that goes down to the beach, a sea wall designed to protect the bluffs from erosion while mitigating impacts to unprotected adjacent bluffs, and the sandy beach area from the toe of the bluff to the mean high-tide line. Similar to many properties along this stretch of coast, the shared staircase connects the homes to the beach area below.

The staircase was built more than 40 years ago, prior to the enactment of the Coastal Act in 1976, and its predecessor law, the Coastal Zone Conservation Act of 1972. In 1973, the staircase partially collapsed and was reconstructed under a permit issued by the County of San Diego[2] following certification from the Coastal Zone Conservation Commission (the Commission's predecessor agency) that its reconstruction was exempt from state permit requirements. Since that time, the homeowners have regularly enjoyed the use of their shared staircase, and they have taken actions to maintain it. The staircase

_____

[2]    The County of San Diego approved the project because the City of Encinitas was not incorporated until 1986.

2

is important to the homeowners, because it provides the only direct access to the beach portion of their properties. The access afforded by the staircase is especially important for Lynch, given her age (close to 80 at the time of the application) and health limitations (very high blood pressure).

In 1986 the homeowners constructed a beach-level seawall and mid-bluff retention structure. In 1989, the Commission determined that these structures, along with the staircase, were consistent with the Coastal Act and issued a Coastal Development Permit (CDP) authorizing them to remain. The CDP issued for these structures had no expiration date.

2. *The city approves the stairway repair and new seawall*

In 2003 the homeowners applied to the City of Encinitas for a permit to replace the aging seawall with a state-of-the-art, textured concrete seawall system that included structural tiebacks and mid-bluff geogrid protection (the Project). The Project was designed to protect not just the homeowners' homes, but also the beach-going public. The permit application specified that portions of the staircase would be removed and then replaced to facilitate construction. As certified by its engineers, the new seawall system's useful life would be 75 years.

In January 2009 the City voted unanimously in favor of the Project. The City found that the Project was consistent with the City's Local Coastal Program, and that it would "not adversely affect the policies of the Encinitas General Plan or the provisions, regulations, conditions or policies imposed by the Municipal Code." As to the staircase, the City's resolution of approval states:

3

"A stairway currently exists on the bluff face and will remain. However, portions of the stairwell most adjacent to the existing mid-bluff retaining wall and lower seawall will be removed as necessary to allow for the installation of the proposed improvements and will be replaced to its original configuration with the same materials, dimensions and colors once the construction of the tieback shotcrete walls are completed."

3. *The homeowners apply to the Commission for a CDP*

As required by the City's approval, the homeowners filed an application with the Commission to amend their existing seawall permit. On December 30, 2009, the Commission issued its first of three staff reports for this Project. In this first report (Staff Report No. 1), Commission staff recommended approval of a 50-foot seawall below Lynch's home, but recommended denial of any seawall to protect Frick's home, denial of the entire-mid-bluff structure, and denial of the replacement of any portion of the staircase removed to facilitate the seawall's construction. Commission staff recommended no expiration date for the seawall; instead, it recommended that, in 30 years, the Commission re-evaluate the need for any additional mitigation that the seawall's impacts on sand loss might require.

On January 15, 2010, there was a hearing on the homeowners' CDP application. However, the Commission staff incorrectly analyzed the homeowners' geological site assessment and building plans, and the hearing was continued to a later date to resolve the misunderstanding.

In December 2010, while the homeowners' application for an amended CDP was still pending before the Commission, a series of large winter storms occurred in Southern California. The storms caused unprecedented flooding and major property damage along

4

the coast. As a result, President Obama declared San Diego County to be an emergency disaster relief area. On December 24, 2010, in the immediate aftermath of a severe storm, the homeowners' bluff suffered a large-scale collapse, followed by additional collapses. These collapses destroyed the existing seawall system and the lower portion of the staircase.

As result of these events, the homeowners amended their CDP application, and the Commission scheduled a second hearing for June 15, 2011.

Due to the new conditions caused by the bluff collapses, in its second staff report dated June 1, 2011 (Staff Report No. 2), the Commission staff recommended a full-length, 100-foot seawall protecting both homeowners' homes, and a mid-bluff structure not to exceed 75 linear feet. However, it once again recommended denial of the staircase reconstruction. The homeowners had believed that they had successfully compromised the staircase dispute by offering a lateral access easement across their beach property at the foot of the bluff to the public in exchange for the Commission's approval of the staircase reconstruction. Like Staff Report No. 1, Staff Report No. 2 did not include or mention a CDP expiration date for the seawall. The Commission staff merely proposed a requirement that the homeowners and the Commission would re-evaluate the need for any additional mitigation in 20 years (as opposed to the original 30).

The hearing on the homeowners' CDP application took place on June 15, 2011. However, the Commission continued the hearing to allow itself further time to consider the homeowners' arguments and evidence.

5

On July 21, 2011, Commission staff published its third and final report (Staff Report No. 3), the report that the Commission ultimately adopted in support of its permit decision. Although just seven weeks had elapsed since the Commission's publication of Staff Report No. 2, Staff Report No. 3 eliminated the idea of reevaluating the need for additional mitigation after 20 years and instead proposed that the seawall permit expire after 20 years from the date of approval. The homeowners would be entitled to have seawall protection for only 20 years, after which they would have to remove the seawall or reapply for a new CDP to keep it (Special Conditions 2 and 3). The expiration requirement was justified as a means of protecting the Commission's "future shoreline planning options," in the event future political and legal changes (i.e., legislation or judicial decisions) allowed the Commission to outright ban seawalls. Under Special Condition 1.a., the staff also recommended outright denial of the repair of the lower portion of the stairway.

Staff Report No. 3 also outlined the adverse impacts of seawalls generally as follows: (1) physical occupation of beach area, (2) long-term beach loss, (3) entrapment of bluff sand, and (4) impacts to unprotected adjacent bluffs. With regard to the specific impacts of the project, Staff Report No. 3 found that general impacts (1) and (2) did not apply because the seawall "will open up approximately 425 sq. ft. of new beach area." General impact (3) was mitigated through a $31,542 payment and general impact (4) was mitigated through engineering and design of the seawall.

The homeowners objected to the seawall and the stairway conditions, both in written objections submitted to the Commission prior to the hearing on August 10, 2011,

6

and in oral testimony at the hearing itself. The Commission nevertheless adopted Staff Report No. 3, requiring the seawall permit to expire in 20 years and denying the stairway reconstruction. The denial of the right to reconstruct the homeowners' stairway resulted in the homeowners not being able to access their beach properties, even though they had previously granted an easement to the public across those properties.

4. *The petition for writ of mandate*

On October 7, 2011, the homeowners timely filed a petition for writ of mandate. In November 2011 the homeowners paid $31,542 in sand mitigation fees and satisfied the myriad other conditions precedent required to obtain the Commission's CDP, including execution of deed restrictions recognizing the objected-to seawall and stairway conditions. On December 6, 2011, the Commission formally issued the seawall permit, and the homeowners proceeded with their Project.

On October 29, 2012, the Commission filed a motion for judgment on the homeowners' petition on the grounds that the homeowners had waived their right to challenge the seawall and stairway conditions because they had executed the deed restrictions. The court found no waiver and denied the motion. The court held that the homeowners "have neither specifically agreed to the conditions nor failed to challenge their validity."

Thereafter, the homeowners filed a motion for judgment on the petition, arguing that the seawall and stairway conditions are unlawful. The trial court agreed, holding that the Commission's denial of the stairway violated the City's Municipal Code and the

7

Coastal Act and that the Commission's imposition of the 20-year expiration date on the seawall violated the Coastal Act and was unconstitutional.

As to the stairway, the trial court found:

> "Petitioners are entitled to reconstruct their beach stairway pursuant to Encinitas Municipal Code and the state Coastal Act. Special Condition (1)(a) impermissibly required Petitioners to delete the stairway reconstruction from their building plans before Respondent would issue a CDP for the construction of a seawall. This condition is invalid as the Encinitas Municipal Code and Local Coastal Program allow Petitioners to reconstruct their stairway which was destroyed by a 'disaster' as that term is defined in Public Resources Code § 30610(g). In imposing Special Condition 1(a), Respondent did not proceed in the manner required by law and its decision was not supported by substantial evidence."

As to the expiration date and reapplication conditions, the trial court found:

> "Petitioners are also entitled to a CDP without an expiration date, and the re-application requirement, imposed through Special Conditions 2 and 3. Respondent had a duty to grant the CDP for the seawall and was not authorized to impose an arbitrary expiration date. Public Resources Code § 30235 requires Respondent to grant a CDP to protect existing structures in danger from erosion. In discharging this affirmative duty, Respondent may not impose arbitrary and unreasonable conditions; only conditions that have a nexus (i.e., logical link) to a specified adverse impact, and then only when such conditions are proportional to the impact, may be lawfully and constitutionally imposed. Special Conditions 2 and 3 do not meet these criteria and are regulatory takings. By imposing Conditions 2 and 3, Respondent failed to proceed in the manner required by law and its findings were not supported by substantial evidence."

The court also held that that the 20-year expiration condition was unnecessary because "the government always has the power to force repair or change should the seawall become unsafe. It may proceed by code enforcement, inverse condemnation, or many other legal practices to protect against a dangerous condition. . . . [T]he 20 year

8

limit is simply a power grab designed to obtain further concessions in 20 years, or force the removal of seawalls at a later time . . . ."

DISCUSSION

A. *Standard of Review*

Here, two standards of review govern our determination of whether the court erred in finding in favor of the homeowners on their petition for writ of mandate.

As to the issue of whether the homeowners waived their right to challenge the seawall and stairway conditions, "'[t]he burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver" [citation].' [Citations.] The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.)

On the issue of whether the conditions imposed were unlawful, because the facts are undisputed, our review is de novo. (*Silvers v. Board of Equalization* (2010) 188 Cal.App.4th 1215, 1219.) "'A court does not, in other words, defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature.'" (*Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1344.)

B. *Waiver*

I would conclude that the Commission did not prove by clear and convincing evidence that the homeowners waived their right to challenge the permits conditions.

9

In order to preserve the right to challenge permit conditions in court, the permit applicant must first inform the Commission of his or her objections, either at or prior to the Commission's hearing on the permit:

> "Any aggrieved person shall have a right to judicial review of any decision or action of the commission by filing a petition for a writ of mandate in accordance with Section 1094.5 of the Code of Civil Procedure, within 60 days after the decision or action has become final. [¶] For purposes of this section . . . an 'aggrieved person' means any person who, in person or through a representative, appeared at a public hearing of the commission, local government, or port governing body in connection with the decision or action appealed, or who, by other appropriate means prior to a hearing, informed the commission, local government, or port governing body of the nature of his concerns or who for good cause was unable to do either. 'Aggrieved person' includes the applicant for a permit and, in the case of an approval of a local coastal program, the local government involved." (§ 30801.)

Before the August 10, 2011 hearing on their CDP, the homeowners submitted written objections to the seawall and stairway conditions. The homeowners also appeared at the Commission hearing to object to those conditions. The homeowners thereafter filed a writ of mandate to challenge the conditions in court. (§ 30801.)

Thus, the homeowners followed all the legal requirements for challenging the CDP conditions, and put the Commission on notice of their objections and their intent to challenge them in court. There was nothing more that the Coastal Act, or any other provision of law, required of the homeowners in order to preserve their right to challenge the conditions.

The Commission contends, and the majority has concluded, that the homeowners waived their right to challenge the conditions by executing deed restrictions

10

acknowledging the permit conditions so that they could proceed with necessary repairs. However, simply acknowledging the permit restrictions is not the equivalent of agreeing to them. As stated, *ante*, at every stage of the proceedings, the homeowners objected to the restrictions. Indeed, the homeowners filed their writ before the Commission issued the CDP. Moreover, the homeowners have not taken any actions to abide by the conditions. As the majority acknowledges, without complying with the permit conditions, there can be no waiver. (*Pfeiffer v. City of La Mesa* (1977) 69 Cal.App.3d 74, 78.)

The Commission points to the following language in the deed restrictions to support its waiver argument:

> "Owner(s) . . . hereby irrevocably covenant[] with the Commission that the Special Conditions (shown in Exhibit B hereto) shall at all times on or after the date on which this Deed Restriction is recorded constitute for all purposes covenants, conditions and restrictions on the use and enjoyment of the Property."

However, agreeing that the permit conditions will attach to the property's deed is not the same as complying with the condition. The purpose of recording the deed restrictions is simply to put possible future purchasers on notice that the restrictions exist. It was not "subterfuge" by the homeowners to record those restrictions, as the majority contends, while still maintaining the right to challenge them. Indeed, the deed restrictions contemplate the possibility that they might be challenged in the future and, in whole or in part be invalidated by including a severability clause that provides, "If any provision of these restrictions is held to be invalid, or for any reason becomes unenforceable, no other provision shall be affected or impaired."

11

Last, the Commission asserts the homeowners waived their right to challenge the permit conditions because they executed the deed restrictions without noting they were doing so "under protest." However, as the Commission concedes, there is no provision in the Coastal Act for accepting a permit "under protest."

The Commission asserts the homeowner's action is barred by the Mitigation Fee Act. (Gov. Code, § 66000 et seq.) This contention is unavailing.

The Mitigation Fee Act was enacted to cure a problem facing developers: They could only challenge fees imposed as a condition of development if they refused to pay the fees. (*Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 241.) If they refused to pay the fees, they could not obtain a building permit. (*Ibid.*) The Legislature enacted the Mitigation Fee Act to "provide[] a procedure whereby a developer could pay the fees under protest, obtain the building permit, and proceed with the project while pursuing an action to challenge the fees." (*Ibid.*) However, the Mitigation Fee Act only applies to local agencies. (Gov. Code, § 66020, subd. (a).)

The Commission asserts that the Mitigation Fee Act bars the homeowners' action because they did not accept the permit restrictions "under protest." However, the Mitigation Fee Act has no application here as the homeowners are not challenging any fees and do not seek money damages from the Commission.

C. *The Seawall Condition*

1. *Development of the Coastal Act*

The Coastal Act's predecessor, the California Coastal Zone Conservation Act of 1972 (former § 27000 et seq.), an initiative measure, established regional control over

12

coastline development. "The Act created 6 regional commissions with jurisdiction over a 'permit area' extending from 1,000 yards inland to the seaward limit of the state's jurisdiction. Within the permit area, the regional commission controlled all development by the issuance of permits." (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 861, p. 1031.) The California Coastal Zone Conservation Act was superseded in 1976 by the Coastal Act. (12 Witkin, *supra,* Real Property, § 861, p. 1032.)

The Coastal Act sets forth policies regarding public access, recreation, marine environment, land resources, new development, and industrial facilities. (12 Witkin, *supra,* Real Property, § 861, p. 1032.)

"The Coastal Act assigns chief responsibility for regulating the use and development of the 'coastal zone' [citation] to a 15-member California Coastal Commission." (12 Witkin, *supra,* Real Property, § 862, p. 1032.) "A local government located within the coastal zone must prepare a local coastal program for the portion of the coastal zone that is within its jurisdiction [citation], which is presented to the Commission for certification." (*Id.* at p. 1033.)

"Coastal development permits are required for most developments in the coastal zone." (12 Witkin, *supra,* Real Property, § 863, p. 1033.) Development permits are issued by local agencies whose local coastal programs have been certified, or in some cases, such as this case, by the Commission. (*Id.* at p. 1034.)

2. *The seawall's 20-year expiration condition imposed by the Commission is contrary to section 30235 of the Coastal Act*

The Coastal Act provides that a seawall "*shall be permitted* when required . . . to protect existing structures . . . in danger from erosion and when designed to eliminate or mitigate adverse impacts on local shoreline sand supply." (§ 30235, italics added.) Thus, the permitting of a seawall is *mandatory* when two conditions are present: (1) an existing structure is in danger from erosion, and (2) the seawall is designed to eliminate or mitigate adverse impacts on the local shoreline sand supply. There is no dispute that both of those conditions are present in this case.

As the majority notes, "the Commission has broad discretion to adopt measures designed to mitigate all significant impacts that the construction of a seawall may have." (*Ocean Harbor House Homeowners Assn. v. California Coastal Com.* (2008) 163 Cal.App.4th 215 (*Ocean Harbor House*).) In that case the Court of Appeal upheld an in-lieu fee on homeowners who sought a seawall permit, on the grounds that the fee mitigated for identified impacts caused by the seawall. (*Id.* at pp. 240-242.)

Unlike the mitigation fee in *Ocean Harbor House*, the permit-expiration condition in this case is not a mitigation condition. The permit expiration does not mitigate any impacts the seawall may cause in the future. Rather, it merely gives the Commission the option to deny the permit outright in 20 years.

The majority concludes that the seawall's 20-year expiration condition is valid as it is "aimed at addressing the project's likely long-term impacts to adjacent, unprotected properties." However, as the Commission itself noted, the impact on adjacent properties

14

was already mitigated through engineering and design of the seawall. In the Commission's words, the seawall "has been designed and conditioned to mitigate its impact on coastal resources such as scenic quality, geologic concerns, and shoreline sand supply."

However, the expiration date on the seawall condition is not intended to address these impacts. Rather, as the Commission has stated, the intent behind the expiration date is "to allow for potential removal of the approved seawall." As the Commission's staff report explains:

> "To ensure that this project does not prejudice future shoreline planning options, including with respect to changing and uncertain circumstances that may ultimately change policy and other coastal development decisions (including not only climate change and sea level rise, but also due to legislative change, judicial determinations, etc.), staff recommends that this approval be conditioned for a twenty-year period. . . . [¶] . . . Of course it is possible that physical circumstances as well as local and/or statewide policies and priorities regarding shoreline armoring are significantly unchanged from today, but it is perhaps more likely that the baseline context for considering armoring will be different . . . ."

Thus, as the Commission makes clear, the expiration date is intended to give the Commission the right in 20 years to deny the homeowners the continued use of a seawall even though it meets design requirements. Because the seawall's condition states that the seawall permit would "expire" after 20 years if the Commission did not agree to a new seawall upon the homeowner's application, that permit condition is directly contrary to the mandatory language of section 30235.

This does not mean the City or Commission cannot review the effects of the seawall in the future. The 20-year seawall permit expiration is unnecessary because, with

15

or without a permit expiration, both the City and the Commission have the power to evaluate the seawall's condition at any time, and to address any actual or potential threat to life or property that the seawall may pose in the future. As the trial court observed, the City and the Commission have the power to force repair or change should the seawall become unsafe, or in need of repair or change. There are many other avenues by which the government may proceed, such as code enforcement or inverse condemnation. The Commission always has the power to implement reasonable regulations related to the sea wall so long as they do not conflict with the Coastal Act.

The Commission also asserts the condition is necessary to "ensure [the seawall's] consistency with the City's local coastal program." However, the policies to which the Commission cites all address the importance of seawall design. (See Encinitas Mun. Code, §§ 30.34.020 (B) (8) & (C)(2)(b).) None of the local program provisions the Commission cites address nondesign requirements, like the permit-expiration condition.

The Commission also contends that requiring the homeowners to apply for a new seawall permit allows them to assess whether the homeowners still need the seawall and whether there are possible alternatives. However, the record contains no evidence to substantiate the Commission's concern that the seawall may no longer be needed. In fact, as the Commission acknowledges "[b]luffs in this area are subject to a variety of erosive forces and conditions" that will only worsen.

The Commission also asserts that it needs the expiration condition in case the homeowners redevelop the bluff tops in a way that no longer justifies the need for a seawall, for example, if new structures are set far enough back from the bluff edge.

16

Again, the Commission seeks to add limiting language to section 30235 where none exists. Section 30235 does not say that a homeowner in need of bluff protection is entitled to a seawall "until such time as redevelopment of the bluff-top makes one unnecessary." The statute entitles the homeowners to a seawall so long as there is a need for it, and there is mitigation for impacts on sand supply. Moreover, there is no evidence in the record that the homeowners will seek to redevelop their properties around the time that the seawall permit is set to expire. Indeed, it is exceedingly unlikely that a homeowner would time an application for redevelopment at the same time as expiration of the seawall permit.

    3. *The seawall condition is unconstitutional*

Even if the permit-expiration requirement was not barred by statute, it would constitute an unconstitutional condition under both the state and federal Constitutions because it is a "taking" of the homeowners' property.

The California Constitution guarantees as "inalienable" the rights of "acquiring, possessing, and *protecting* property, and pursuing and *obtaining safety,* happiness, and privacy." (Cal. Const., art. I, § 1, italics added.) Similarly, the takings clause of the 5th Amendment to the United States Constitution protects a homeowner's use and protection of its property. (*Nollan v. Cal. Coastal Com.* (1987) 483 U.S. 825, 833-834 (*Nollan*).) The right to use, enjoy, and protect property is not a government privilege, but a fundamental, constitutional right. (*Id.* at p 833, fn. 2 ["[T]he right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements—cannot remotely be described as a 'governmental benefit.'"].) A person's

17

property rights exist regardless of the regulatory restrictions that subsequently burden those rights. (*Nectow v. Cambridge* (1928) 277 U.S. 183, 187; *Euclid v. Ambler Realty Co.* (1926) 272 U.S. 365, 384.) A zoning change or governmental dictate that interferes with such continued use is unconstitutional. (*Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 552 ["'The rights of users of property as those rights existed at the time of the adoption of a zoning ordinance are well recognized and have always been protected.'"]

The right to continue a particular use of land is a "property right." A permitting agency cannot, except under narrow circumstances, revoke its approval once it is granted. (*Korean American Legal Advocacy Foundation v. City of Los Angeles* (1994) 23 Cal.App.4th 376, 391, fn. 5.) A lawfully issued permit may only be revoked where, after notice and a fair hearing on revocation, the agency has determined that the permittee's use has created a nuisance, or the permittee has otherwise violated the law or failed to comply with the permit's conditions. (*Community Development Com. v. City of Fort Bragg* (1988) 204 Cal.App.3d 1124, 1131-1132 ["A municipality's power to revoke a permit is limited" and "may not be revoked arbitrarily without cause," and "notice and hearing must be afforded a permittee prior to revocation of a use permit".]; Gov. Code, § 65905.) None of those situations exist in this case.

These constitutional rights and property interests are protected in the permitting process because individuals in that situation are particularly vulnerable to government pressure to give them up. (*Koontz v. St. Johns River Water Mgmt. Dist.* (2013) 133 S.Ct. 2586, 2594-2595 ["[L]and-use permit applicants are especially vulnerable

to . . . coercion . . . [and] [e]xtortionate demands."].) The unconstitutional conditions doctrine provides that "'the government may not deny a benefit to a person because he exercises a constitutional right.'" (*Id.* at p. 2594.)

The United States Supreme Court applied the unconstitutional conditions doctrine in the land-use context in *Nollan, supra,* 483 U.S. 825, and *Dolan v. City of Tigard* (1994) 512 U.S. 374. These cases hold that the takings clause allows the government to take a property interest as a condition of permit approval, but only if the condition bears an essential nexus and "rough proportionality" to adverse impacts caused by the proposed project. (*Nollan, supra,* 483 U.S. at p. 837 [requiring an "essential nexus" between a permit condition and the adverse impacts caused by the proposed project); *Dolan, supra,* 512 U.S. at p. 391 [requiring "rough proportionality"].) Otherwise, the condition is unconstitutional. (*Dolan,* at p. 385.)

Here, the Commission's condition that the seawall permit expires in 20 years unconstitutionally forces the homeowners to waive their rights and property interests without any nexus or "rough proportionality" to potential adverse impacts caused by the seawall.

The condition forces the homeowners to waive their present and future rights to protect their homes, as guaranteed to them by section 30235 of the Coastal Act and the California Constitution. Despite substantial evidence establishing that the homes will continue to be threatened, the condition effectively extinguishes their right to protect their properties, beginning in 2031. The fact that the homeowners may apply to the Commission "to either remove the seawall in its entirety, change or reduce its size or

19

configuration, or extend the length of time the seawall is authorized" does not guarantee their property rights because the Commission may decide to deny the permit. Indeed, the Commission has stated that the reason for the condition is "to allow for potential removal of the approved seawall."

Section 30235, along with the constitutional right to protect one's property, *mandate* authorization of the seawall to protect against erosion. Unless the seawall became a nuisance in 2031, and the homeowners were given notice, a fair hearing and adequate findings to justify the seawall removal, the Commission would have no basis for revoking the seawall.

The expiration condition in essence requires the homeowners to convey to the Commission a negative easement across their bluffs. A negative easement imposes "'specific restrictions on the use of the property'" it covers. (*Wooster v. Department of Fish & Game* (2012) 211 Cal.App.4th 1020, 1026.) It "prevent[s] acts from being performed on the property [and] may be created by grant, express or implied." (*Wolford v. Thomas* (1987) 190 Cal.App.3d 347, 354.) A negative easement is "property" within the meaning of the takings clause, and when the government subjects land to a negative easement in its favor, it must pay for it. (*Southern Cal. Edison Co. v. Bourgerie* (1973) 9 Cal.3d 169, 172-173.)

Expiration of the seawall permit in 2031 extinguishes the homeowners' right to their seawall and gives the Commission the discretion to require the seawall's removal. Indeed, as discussed, *ante*, the Commission's express intent behind the expiration condition is to allow for removal of the seawall. The Commission has made clear its

20

opposition to seawalls in general, and the homeowners' seawall in particular. When the homeowners' seawall permit expires, the Commission will have a negative easement over the homeowner's bluff, without paying for it as required by the takings clause.

The condition also requires the homeowners to pay another CDP application fee to the Commission, along with additional engineering and consultant fees, when the permit expires in order to again prove their right to protect their homes. These are monetary obligations imposed on the homeowners that are unrelated to any adverse impacts that the seawall might have on sand supply loss. Money is property under the takings clause, and, in the permitting context, monetary exactions must be shown to have an essential nexus and rough proportionality to a project's impact. (*Koontz, supra,* 133 S.Ct. at p. 2603.)

The Commission demands relinquishment of the homeowners' rights and interests without making the constitutionally required connection to the impact of the seawall. The Commission does not identify any adverse impacts attributable to the seawall that justify waiver of their constitutional and statutory rights. The Commission does not identify what adverse impacts justify dedication of a negative easement across their bluffs. The Commission also does not identify what adverse impacts justify extra monetary costs imposed on the homeowners.

In sum, for all the foregoing reasons, the permit-expiration requirement is an unconstitutional condition.

D. *The Stairway Prohibition*

Both City's Local Coastal Program and the Coastal Act provide that "any structure . . . destroyed by a disaster" may be replaced and is exempt from the

requirement of a CDP. (Encinitas Mun. Code, § 30.80.050, subd. (E); Pub. Resources Code, § 30610, subd. (g).) A "disaster" is defined as "any situation in which the force or forces which destroyed the structure to be replaced were beyond the control of its owner." (§ 30610, subd. (g)(2)(A).)

Here, severe winter storms in December 2010 caused the bluff to collapse and take down part of the homeowners' stairway. The forces that caused the stairway's partial destruction were beyond the homeowners' control. Further, even if the homeowners' stairway reconstruction did not qualify for the "disaster" exemption, it would still qualify as a "repair" activity that is exempt from the CDP requirement.

Both the Encinitas Municipal Code and the Coastal Act provide that "no coastal development permit shall be required" for "[r]epair and maintenance activities to existing structures or facilities that do not result in an addition to, or enlargement or expansion of the structures or facilities . . . ." (Encinitas Mun. Code, § 30.80.050, subd. (C); Pub. Resources Code, § 30610, subd. (d).) The replacement of less than 50 percent of a structure is considered a "repair" of that structure entitled to CDP exemption. (Cal. Code of Regs., tit. 14, § 13252, subd. (b).) The majority does not dispute that the staircase constitutes a "structure" under the statute and the municipal code, or that the homeowners were seeking to repair less than 50 percent of that structure. Thus, pursuant to both the municipal code and the Coastal Act, no CDP was required for the repairs to the staircase.

The Commission asserts, and the majority concludes, that the application of the City's "Coastal Bluff Overlay Zone" (CBOZ) regulations exclude the homeowners'

22

stairway from the benefits of the exemptions under the Coastal Act and the City's Local Coastal Program. This contention is unavailing.

The CBOZ does not exclude the homeowners' stairway from the disaster or repair exemptions. The CBOZ states that "[e]xisting legal structures . . . on the face of a bluff may remain unchanged" and may be maintained. (Encinitas Mun. Code, § 30.34.020, subd. (B)(4).)

The Commission also cites the City's "structural nonconformity" regulations for the proposition that they can only be repaired or maintained, but not replaced. Assuming that the stairway meets the definition of a "structural nonconformity," its reconstruction is still entitled to CDP exemption. Encinitas Municipal Code section 30.76.050, subdivision (C) states repair and maintenance may be performed on a structural nonconformity "so long as the nonconformity is not enlarged, relocated or increased in intensity . . . ."

Finally, to the extent the City's Local Coastal Program and general policy statements could be interpreted to prohibit stairway reconstruction, they would be invalid under the Coastal Act. Section 30005, subdivision (a), allows a city to impose stricter "conditions, restrictions, or limitations," but only if they are "not in conflict with this act." (See *Yost v. Thomas* (1984) 36 Cal.3d 561, 572-573 [local coastal programs must conform to the Coastal Act]; *McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 930, fn. 9 [same].) Section 30610, subdivision (g) provides that "no coastal development permit shall be required pursuant to this chapter for the following

types of development and in the following areas: [¶] . . . [¶] [t]he replacement of any structure . . . destroyed by a disaster."

The Commission asserts that this exemption is limited by the following sentence in section 30610, subdivision (g) that states "[t]he replacement structure shall conform to applicable existing zoning requirements." (§ 30610, subd. (g)(1).) The Commission interprets this sentence to mean "the replacement of a structure destroyed by a disaster also must conform to applicable zoning requirements." However, as that sentence makes clear, it is the "structure," not its replacement, that must conform to applicable zoning requirements. Thus, it is the *structure's* design, aesthetics and dimensions that must comply with local zoning regulations. However, no zoning regulation can be contradictory to the law governing the question of whether a particular replacement *project* is entitled to exemption. As is made clear in section 30610, subdivision (g)(1), the stairway repair project is exempt.

Moreover, as the trial court correctly found, the City of Encinitas's land use policies, specifically, policy 1.6 of the Public Safety Land Use Element and Circulation Policy 6.7, discouraging structures on bluffs, explicitly refer to "new" structures and private accessways. Thus, they do not apply to repairs to existing structures.

E. *The Trial Court's Order that the Commission Remove the Conditions*

The Commission asserts that rather than striking the offending conditions from the homeowners' permits, the court should have remanded the matter to allow it to "revise or to consider revisions to the conditions." The contention is unavailing.

24

Because the court exercised its independent judgment in striking down the offending conditions, it was not required to remand the matter for reconsideration. (*Levingston v. Retirement Board* (1995) 38 Cal.App.4th 996, 999-1001.)  Because there is no circumstance under which the expiration date and stairway denial could be revised to make them consistent with applicable law, no remand to the Commission for additional review was required.

For all the foregoing reasons, I would affirm the judgment of the trial court striking the seawall permit expiration and stairway conditions.

NARES, J.